ǀ

## MATTER OF PICONE

## In EXCLUSION Proceedings

## A-12323330

*Decisions by Board April 27, 1962 and July 12, 1962*
*Decided by Attorney General January 21, 1963*

An overt voluntary act manifesting clearly and unambiguously a decision to accept a foreign nationality previously acquired by operation of law, even though such act in and of itself may not constitute a statutory ground of expatriation, results in the loss of United States citizenship under section 2 of the Act of March 2, 1907, and the loss of citizenship dates from the time of the act of acceptance [*Matter of Di P—*, Int. Dec. #1215, upheld].

APPLICATION: Admission as United States citizen.

### BEFORE THE BOARD

The special inquiry officer ordered the applicant admitted as a United States citizen and certified the case to the Board for final decision. We shall reopen proceedings.

Applicant, born in Italy on January 15, 1932, claims to be a United States citizen through birth to Giuseppe Picone who in 1922 became a United States citizen by naturalization. The Service contends that applicant's father lost United States citizenship by later becoming naturalized in Italy before applicant was born. The Department of State has ruled that as a matter of law Giuseppe Picone could not have lost United States citizenship in the manner relied upon by the Service.

Pertinent portions of relevant statutes follow:

That any American citizen shall be deemed to have expatriated himself when he has been naturalized in any foreign state in conformity with its laws, or when he has taken an oath of allegiance to any foreign state. (Section 2, Act of March 2, 1907, 34 Stat. 1228)

There shall be recovery of Italian citizenship by one who having ceased to be an Italian citizen owing to the acquisition of foreign citizenship, has been resident in the kingdom for two years. (Article 9 (3), Italian Nationality Law, June 13, 1912, UNITED NATIONS PUBLICATION, LAWS CONCERNING NATIONALITY, July 1945, 269)

These are the facts of record. The exclusion hearing reveals that applicant's father was naturalized in the United States on March 16, 1922, that he secured a United States passport on March 27, 1922, that he went to Italy to marry, that he returned to the United States in October 1923 (his wife never came), that he next went to Italy on December 17, 1925 on a United States passport issued on October 20, 1925, and that he remained in Italy until his death in 1958.

An affidavit executed by Giueseppe Picone on February 6, 1953 reveals that he left behind no property in the United States when he returned to Italy, but in Italy owned farm land and three houses valued at about 15,000,000 lire, that part of the property was inherited and part purchased from 1922 to 1947, that property tax was paid in Italy but no taxes were paid to the United States, that on April 18, 1928, he was issued an Italian Identity Card No. 2179 by the Commune of Carini, that the card showed his nationality as Italian, that he is of the belief that he voted in 1934 and in all the following elections held in Italy from 1946 to 1952 but remembers well only having voted in 1951 and 1952, that he announced his American citizenship to local authorities, that he had never renounced his American citizenship, that he did not know that naturalized citizens were supposed to return to the United States before October 15, 1946, and that he had not been in contact with the Consulate at Palermo, Italy since his arrival in Italy. The affidavit shows that applicant's father stated it was his intention to establish United States citizenship because his son, the applicant, wished to come to the United States. This affidavit and another executed the same day reveal that Giuseppe Picone's return to Italy in 1925 was for the purpose of taking his father to the United States, because his father had been left alone after the death of his wife (1920), that two brothers were residing in the United States, that his father's death in 1941 and the circumstances which arose subsequently caused his protracted residence in Italy, and that it was his intention to return to the United States to reside permanently if he were authorized to do so.

On February 16, 1953, the Vice Consul at Palermo issued a certificate of expatriation finding the applicant's father had lost United States citizenship under section 2 of the Act of March 2, 1907 by having been naturalized as a subject of Italy under article 9(3) of the Italian Nationality Law of June 13, 1912 and having manifested a voluntary acceptance of such nationality. This certificate was approved by the Secretary of State on September 9, 1953.

Applicant's father died in Italy on March 23, 1958. The applicant requested a review of his case. On February 23, 1961, the American Consul at Palermo informed the Department of State that a review of Giuseppe Picone's case resulted in the determination that the

naturalization granted by operation of Italian law may not have expatriated applicant's father under the provisions of section 2 of the Act of March 2, 1907 but that he did become expatriated (after applicant's birth) by voting in elections held in Italy in 1951. The Department of State concurred in the finding that the applicant's father had not lost United States citizenship by accepting the Italian naturalization and had not lost United States citizenship until he had voted in 1951. The applicant was, therefore issued a United States passport.

The action of the Department of State in reversing its former finding that the applicant's father had lost United States nationality by accepting the Italian naturalization is based on the following reasoning:

The Department of State, after the most careful consideration and study in the light of recent important court decisions, has reversed its long standing policy that expatriation under the first paragraph of section 2 of the Act of March 2, 1907 may be based upon the fact that a person has acquired a foreign nationality solely by operation of law (as, for example, under section 9(3) of the Italian Nationality Law of June 13, 1912), followed by overt acts voluntarily performed, which may be regarded as "acceptance" of the foreign nationality. Underlying this determination was the Department's belief, particularly in the light of the Supreme Court decision in the case of *Nishikawa v. Dulles* [356 U.S. 129 (1958)] that an administrative decision that a person has lost United States citizenship will be upheld by the courts only if the decision is based upon an act which must be both voluntary and specifically made expatriating by statute. (Ex. 5)

The special inquiry officer, in a most comprehensive opinion, points out that the Service had the burden of establishing (by evidence that was clear, convincing, and unequivocal) that applicant's father had accepted Italian nationality. The special inquiry officer found that the Service had not borne its burden. The special inquiry officer held that the prolonged residence in Italy had been partially explained away by the applicant's father, and that in any event, it did not constitute an acceptance of Italian nationality. The special inquiry officer held that the obtaining of an identity card, without eliminating the possibility that it was procured under duress, necessity, or ignorance, did not constitute an acceptance; and that the voting concerning which there is certainty (the voting in 1951 and 1952) is too remote to establish that in 1927, some 24 years earlier when Italian nationality had become available, the applicant's father had formed the intention of accepting Italian nationality. In a letter dated December 20, 1961, counsel asks that the order of the special inquiry officer be confirmed and that the position of the State Department be fully considered. At oral argument the Service representative contended that the applicant was not a United States citizen at birth because his father had ex-

patriated himself by, among other things, registering as an Italian national.

Briefly, the "long standing policy" to which the Department of State refers, as it related to Italy, took cognizance of the fact that until July 1943, Italy regarded any naturalized American citizen of Italian origin who resided in Italy for two years after July 1, 1912 as having acquired Italian nationality under article 9(3) of the Itialian Nationality Law of 1912 by no other act than mere residence in Italy for the period of two years regardless of whether the naturalized American citizen desired to become an Italian citizen or not.[1]

Nevertheless, the United States did not consider acquisition of Italian nationality in such a manner as causing loss of American citizenship under section 2 of the Act of March 2, 1907 unless the individual manifested a voluntary acceptance of Italian nationality by declaration, or overt act such as accepting employment by the Italian Government, accepting an Italian passport or identity card, voting in Italy, or joining an Italian political party. (HACK-WORTH, DIGEST OF INTERNATIONAL LAW, Vol. 3, Government Printing Office, 1942, 207–217; *Barsanti v. Acheson*, 103 F. Supp. 1011, Mass. (1952), aff'd 200 F. 2d 562, C.A. 1; *Rosasco v. Brownell*, 163 F. Supp. 45, 55, E.D.N.Y. (1958); *United States v. Cuccaro*, 138 F. Supp. 847, E.D.N.Y. (1956); *U.S. ex rel. De Cicco v. Longo*, 46 F. Supp. 170, Conn. (1942); *Matter of P—*, Int. Dec. No. 1155; *Matter of M—*, 6 I & N. Dec. 70).

The abandonment of the "long standing policy" by the Department of State was noted in *Matter of P—*, Int. Dec. No. 1155, but was not considered because we found there that the Service had failed to bear its heavy burden of showing that P— had voluntarily accepted Italian naturalization. In *Matter of D—P—*, A–12561169, Int. Dec. No. 1215, 4/26/62, a reevaluation of the problem in light of *Nishikawa* caused us to hold that since the burden of proof was upon the Government to prove expatriation by clear, convincing, and unequivocal evidence, we could no longer indulge in the fiction that acceptance of Italian naturalization which arose by operation of law implied that there had been an acceptance *as of the date of the naturalization*. We did not discuss the issue raised here—the propriety of finding that it was possible to accept naturalization by an act which was not in itself a ground of expatriation. In the instant case there is considerable evidence that the Italian naturalization was voluntarily accepted by the applicant's father. It becomes necessary, therefore,

---

[1] After July 1943 the Italian Government gave some recognition to the intention of the naturalized American citizen of Italian origin as to whether he desired to become an Italian national.

to decide whether to join the Department of State in what appears to be its view that as a matter of law, a person cannot become expatriated under a law which makes him a foreign national solely by operation of law, although there are overt acts voluntarily performed which may be regarded as acceptance of the foreign nationality.

The Department of State relies upon *Nishikawa* v. *Dulles*, 356 U.S. 129, as requiring abandonment of the established rule. We must respectfully dissent from this view. *Nishikawa* was not concerned with substantive issues of expatriation but with issues which related "solely to problems of burden of proof," (at p. 662). As to the burden of proof, the court held that "regardless of what conduct is alleged to result in expatriation, whenever the issue of voluntariness is put in issue, the Government must in each case prove voluntary conduct by clear, convincing, and unequivocal evidence". This is, of course, the burden which must be met by the Government in the instant case. However, we do not believe that *Nishikawa* attempts to be controlling on what is or is not an act of expatriation.

*Nishikawa* did not concern itself with section 2 of the Act of March 2, 1907 which is involved here. *Nishikawa* dealt with expatriation under section 401(c) of the Nationality Act of 1940 which involved service in the armed forces of a foreign country. *Nishikawa* does not state that a person could not have become naturalized in a foreign country by voluntarily acquiring a foreign nationality which as far as the United States is concerned he was free to accept or reject as he pleased. There is no logical reason why an individual who had been naturalized in the United States could not voluntarily accept Italian nationality which was offered to him by Italian law. The only problem we see raised is one of proof.

The issue here is whether there was a voluntary acceptance of Italian nationality. Before we decide whether there was such a voluntary acceptance, we believe further information, if it is available, should be supplied on the following matters: what is involved in obtaining an Italian identity card, whether an Italian identity card is available to one of dual nationality, why it was obtained in the instant case, whether applicant's father could have continued to live in Italy without obtaining one, what benefits and what obligations are involved in obtaining one, whether application had ever been made for documentation for the emigration of applicant's grandfather, and why, if the applicant's father returned to Italy in 1925 to bring his father back to the United States, he did not do so, what military document, employment card, and party certificates are referred to on page 2 of the application for registration executed by applicant's father on February 6, 1953 (Ex. 2), whether the applicant's father who is shown as not having paid taxes to the United States, was liable for the pay-

ment of United States taxes, and whether applicant's father as a United States national was treated differently for tax purposes by the Italian Government than he would have been if he had not been a United States national. Any other pertinent information should, of course, be made a part of the record.

ORDER: It is ordered that the order of the special inquiry officer be and the same is hereby withdrawn.

*It is further ordered* that proceedings be reopened for the reasons contained in this opinion and for such further action as the special inquiry officer may deem appropriate.

## BEFORE THE BOARD

The Commissioner requests that this case be certified to the Attorney General for review. An issue of fact and an issue of law are involved. The issue of law is whether United States citizenship is lost under section 2 of the Act of March 2, 1907, 34 Stat. 1228, by a foreign naturalization arising solely by operation of law under section 9(3) of the Italian Nationality Law of June 13, 1912 where the naturalization is followed by voluntary acts not in themselves made acts of expatriation by statute but which do show an acceptance of the Italian nationality.

The Service and the Board adhere to the rule that a foreign naturalization arising by operation of law may be accepted by an act which is in itself not a ground of expatriation. The Department of State is of the belief that expatriation cannot occur unless an act is performed which is expressly made one of expatriation by statute.

The factual question, assuming that the first question is answered in the affirmative, is whether the applicant has conducted himself in a manner as to indicate his acceptance of Italian nationality.

The Board has ordered reopening of proceeding for additional evidence as to the nature of the acts of acceptance and as to other background matters. The Service however finds it inadvisable to await resolution of the factual issue. The Service states that it is faced with a serious, urgent and continuing problem arising out of the differences between the Service and Board on one hand and the Department of State on the other which makes it imperative to obtain a prompt ruling on the legal issue. The Board believes that until the additional information is obtained, the record will not be in the state necessary for a proper determination; however, under the regulations it has no alternative to complying with the Commissioner's request that the case be certified.

ORDER: Under the provisions of 8 CFR 3.1(h)(1)(iii), the case is referred to the Attorney General for review of the Board's decision.

144

## BEFORE THE ATTORNEY GENERAL

This case has been certified to me for review by the Board of Immigration Appeals pursuant to 8 CFR 3.1(h) (1) (iii).

The applicant seeks admission as a United States citizen. His claim to citizenship is based on the assertion that his father was a United States citizen at the time of his birth in Italy in 1932, R.S. § 1993.[1] The Immigration and Naturalization Service concedes that applicant's father was naturalized in the United States in 1922, but contends that he had expatriated himself prior to applicant's birth. The special inquiry officer held that the Service had not sustained its burden of establishing that applicant's father had lost his United States citizenship prior to the applicant's birth and ordered that applicant be admitted as a United States citizen. The Board of Immigration Appeals ordered that the proceedings be reopened for the taking of additional evidence on the question of expatriation. Following denial of a motion by the Service for reconsideration of the Board's order,[2] the Service requested that this case be certified to me for review limited to the question of the correct interpretation of the statute which is the basis for the claim of expatriation. There is no dispute between the Board and the Service on this question. Since, however, the Department of State has taken a contrary position, the Service desired that this conflict in administrative interpretations be resolved prior to the remand of the case to the special inquiry officer.[3] Although it is ordinarily the better practice to refer to the Attorney General only cases in which the Board has reached a final decision on the merits, I am accepting this case because the legal question involved is a recurring one and its resolution does not hinge on the particular facts shown by the record.

I

The record shows, and I assume for the purpose of this opinion, the following facts:

Applicant's father, a native of Italy, was naturalized in the United States in 1922 and returned to Italy that same year. He returned to the United States in 1923, returned to Italy in December 1925 and remained there until his death in 1958. The applicant was born in

---

[1] R.S. § 1993, in force in 1932, conferred United States citizenship on children born outside the United States whose fathers at the time of their birth were citizens of the United States and had resided therein.

[2] The motion for reconsideration was directed to the question of the burden of proof on the issue of expatriation. This question is not before me on this review.

[3] In such cases the rulings of the Attorney General are controlling. Immigration and Nationality Act, § 103(a), 8 U.S.C. 1103(a).

145

Italy on January 15, 1932, and lived there until he applied for admission to the United States in June 1961.

Whether or not applicant is a United States citizen depends on whether his father was a United States citizen on applicant's date of birth. R.S. § 1993, *supra*. The Service contends that the father had expatriated himself prior to January 15, 1932, under section 2 of the Act of March 2, 1907, 34 Stat. 1228, by acquiring and voluntarily accepting Italian citizenship. The relevant portion of section 2 reads as follows:

That any American citizen shall be deemed to have expatriated himself when he has been naturalized in any foreign state in conformity with its laws, or when he has taken an oath of allegiance to any foreign state.[4]

Article 9 of the Italian Nationality Law of June 13, 1912, provides:

He who has lost citizenship * * * may reacquire it * * * (3) after two years of residence in the Kingdom, if the loss of citizenship has been due to the acquisition of foreign citizenship.

It is conceded in this proceeding that article 9 had the effect of automatically conferring Italian citizenship upon applicant's father after he had completed 2 years' residence in Italy. See 3 Hackworth, *Digest of International Law* (1942) 212.

Such a "naturalization" is within the literal coverage of section 2 of the Act of March 2, 1907, *Matter of M—*, 6 I. & N. Dec. 70, 71 (1953). It has long been held, however, that section 2 applies only to voluntary

---

[4] Section 2 further provides:

When any naturalized citizen shall have resided for two years in the foreign state from which he came, or for five years in any other foreign state it shall be presumed that he has ceased to be an American citizen, and the place of his general abode shall be deemed his place of residence during said years: *Provided, however,* That such presumption may be overcome on the presentation of satisfactory evidence to a diplomatic or consular officer of the United States, under such rules and regulations as the Department of State may prescribe: *And provided also,* That no American citizen shall be allowed to expatriate himself when this country is at war.

However, this presumption of loss of citizenship arising from prolonged residence abroad was interpreted by Attorney General Wickersham, 28 Ops. A.G. 504 (1910), to operate merely to relieve the Government of the obligation of protecting citizens residing abroad and to have no effect on the status of citizenship itself. This view has been followed in *Camardo v. Tillinghast*, 29 F. 2d 527 (C.A. 1, 1928); *In re Alfonso*, 114 F. Supp. 280 (D.N.J. 1953); *Garcia Laranjo v. Brownell*, 126 F. Supp. 370 (N.D. Cal. 1954). While judicial authority to the contrary is not lacking, *Zimmer v. Acheson*, 191 F. 2d 209 (C.A. 10, 1951); *Rosasco v. Brownell*, 163 F. Supp. 45, 55–57 (E.D. N.Y. 1958), I find the opinion of Attorney General Wickersham rendered a relatively short time after the enactment of the statute, the more persuasive, and I adhere to it.

Section 2 of the Act of 1907 was repealed prospectively by the Nationality Act of 1940, 54 Stat. 1137, 1172, and therefore affects only cases involving acts that occurred during the period 1907 to 1941.

expatriation, *Perkins* v. *Elg*, 307 U.S. 325, 343 (1939), and that where a citizen of the United States acquires a foreign nationality through operation of law and not upon his own application, his United States citizenship is not lost unless he indicates acceptance of the foreign nationality by some voluntary affirmative act, *Matter of V—*, 3 I. & N. Dec. 671 (1949); *Matter of R—*, 6 I & N. Dec. 15 (1953); *Barsanti* v. *Acheson*, 103 F. Supp. 1011 (D. Mass. 1952) aff'd *per curiam* 200 F.2d 562 (C.A. 1, 1953); 3 Hackworth's *Digest*, 211–215. Such acts have been held to include accepting a passport or identity card describing the individual as a national of the foreign country, voting in an election of such country, or joining an organization open only to its nationals, *Matter of V—*, *supra*, at 674; 3 Hackworth's *Digest*, at 213. Most of the cases in which these principles were applied have involved article 9 of the Italian Nationality Law. Since the voluntary act showing acceptance of the foreign nationality was regarded merely as evidence of the intent existing at the time such nationality was acquired, it was held that once the act was shown, the expatriation would relate back to the date when the foreign nationality was acquired by operation of law, *Matter of V—*, *supra*, at 674; *Matter of M—*, *supra*.

However, the Board of Immigration Appeals has recently reexamined this rule of retroactivity and has concluded that in the light of the Supreme Court's statement in *Nishikawa* v. *Dulles*, 356 U.S. 129, 133 (1958), to the effect that the Government must show expatriation by clear, convincing and unequivocal evidence, there is "no longer any justification for indulging in the fiction that the act showing acceptance of Italian nationality invariably also shows a voluntary acceptance of Italian nationality as of the first possible moment such acceptance could be made," *Matter of DiP—*, Int. Dec. No. 1215 (1962). Consequently, it is now the Board's position that expatriation dates from the time of the act indicating acceptance of the foreign nationality and not from the time when that nationality was acquired by operation of law. Applying this rule in the instant case, the Board found the record incomplete and remanded the case to the special inquiry officer to take further evidence as to the nature of the acts relied on by the Service to manifest voluntary acceptance of Italian nationality.

## II

The applicant, on the other hand, urges me to adopt the position recently taken by the Department of State in its administration of the nationality laws. This position is stated by the Department as follows:

The Department of State, after the most careful consideration and study in the light of recent important court decisions, has reversed its long standing pol-

icy that expatriation under the first paragraph of section 2 of the Act of March 2, 1907 may be based upon the fact that a person has acquired a foreign nationality solely by operation of law (as, for example, under section 9(3) of the Italian Nationality Law of June 13, 1912), followed by overt acts voluntarily performed, which may be regarded as "acceptance" of the foreign nationality. Underlying this determination was the Department's belief, particularly in the light of the Supreme Court decision in case of *Nishikawa* v. *Dulles* [356 U.S. 129 (1958)], that an administrative decision that a person has lost United States citizenship will be upheld by the courts only if the decision is based upon an act which must be both voluntary and specifically made expatriating by statute.

The question before me on this review is whether to adhere to the long-standing administrative view that voluntary acceptance of a naturalization obtained by operation of law results in expatriation under the Act of 1907 or to adopt the conclusion of the Department of State that in such circumstances the voluntary act cannot result in expatriation unless the act itself is specifically made an expatriating act by the statute.[5] In a memorandum submitted in support of its position, the Department argues that *Nishikawa* establishes that expatriation must be shown by clear, convincing and unequivocal evidence, and that where the act relied on to establish expatriation is not, standing alone, an expatriating act under the statute, then, as a matter of law, it cannot be so clear, convincing and unequivocal as to justify a finding of intent to renounce United States citizenship.

I cannot accept the view that the substantive law of expatriation is affected by the decision in *Nishikawa* v. *Dulles*. The opinion in that case states that the Government has the burden of proving "an act that shows expatriation by clear, convincing and unequivocal evidence." 356 U.S., at 133. But the question of the quantum of proof necessary to establish expatriation is quite separate from the substantive question of what voluntary conduct, assuming it is proved, results in expatriation under section 2. In the *Nishikawa* case the "act" of expatriation upon which the Government relied was service in a foreign army; here the "act" is naturalization in a foreign state. There, as here, an issue was raised as to the voluntariness of the act upon which reliance was placed. Although the Court in *Nishikawa* held that the burden of proof on this issue must be borne by the Government, and that the standard of proof to be met was "clear, convincing and unequivocal evidence,"[6] it did not by any means hold,

---

[5] Thus the Department of State would attach no legal significance to the naturalization by operation of law, and expatriation, if established, would be grounded entirely on the subsequent expatriating act.

[6] Following the decision in *Nishikawa* v. *Dulles*, Congress enacted section 19 of Public Law 87-301, 75 Stat. 650, 656, which added to section 349 of the Immigration and Nationality Act, 8 U.S.C. 1481, a new subsection (c) providing that when loss of United States nationality is put in issue in an action or proceeding commenced on or after September 26, 1961, the fact that such a loss

as the Department of State in effect argues, that the evidence adduced on the issue of voluntariness could relate only to incidents that would independently furnish grounds for expatriation. The opinion clearly contemplates that the voluntariness of Nishikawa's service in the Japanese armed forces could be shown by evidence of any acts or declarations having the requisite probative value, whether independently expatriating or not.

## III

Nevertheless, the position taken by the Department of State, as well as the Board's own modification of the voluntary acceptance rule in *Matter of DiP—, supra*, suggests the desirability of a re-examination of the rule obtaining in cases of naturalization by operation of law.

The language of section 2 is that an American citizen shall be deemed to have expatriated himself "when he has been naturalized in any foreign state in conformity with its laws * * *." There is no exception in the statute for involuntary naturalization, but such an exception has been read into the statute, *Perkins* v. *Elg, supra*, at 343, and would today appear to be a constitutional requirement, *Perez* v. *Brownell*, 356 U.S. 44, 61 (1958). Naturalization by operation of law has long been considered to be within the exception for involuntary naturalization, although as a matter of strict logic a citizen whose voluntary acts, such as foreign residence, give rise to a foreign naturalization could be held to the legal consequences of his actions regardless of whether he knew those consequences would ensue. See *Mackenzie* v. *Hare*, 239 U.S. 299 (1915); *Savorgnan* v. *United States*, 338 U.S. 491 (1950).[7] However, the term "naturalization" ordinarily connotes a deliberate and purposeful acquisition of a changed citizenship status. For that reason, it is unlikely that Congress intended to expatriate by section 2 a citizen who, unaware of the consequences, performed a voluntary act which brought about a foreign naturalization. The section should not be interpreted in such a way as to make it a trap for the unwary.[8]

---

occurred may be established by "a preponderance of the evidence." This enactment has no application to the present proceeding, which was instituted before September 26, 1961.

[7] *Perkins* v. *Elg, supra*, is not authority to the contrary. In that case the citizen was a minor at the time of her foreign naturalization and therefore was not legally responsible for the acts giving rise to the naturalization.

[8] The Department of State points to the following passage in the Congressional debate on section 2 as evidence that the section was intended to have no application to naturalization by operation of law:

Cong. Lacey: "* * * If a man buys a piece of land or a piece of real estate [in Mexico] it is necessary for him to say in the deed that he does not desire

Footnote continued on following page.

It does not follow, however, that because the statute does not apply to every naturalization by operation of law, it should apply to none. Every naturalization occurs by operation of law in the sense that the law of the foreign country operates on a given set of facts, which may consist of residence in that country for a certain period of time, an application for naturalization, an oath of allegience, or some other act or event. When we distinguish for purposes of section 2 between a voluntary naturalization and one which is at least *prima facie* involuntary because it arose by operation of law, we import into section 2 a requirement that for expatriation to result there must be an intent on the part of the citizen to acquire the foreign nationality, and where the acts which give rise to the naturalization, though voluntary in themselves, are not such acts as ordinarily give rise to naturalization, we presume that they have been performed without this required intent.[9] Thus, in cases involving article 9 of the Italian Nationality Law, we regard a mere two years' residence in the country of the citizen's former nationality as insufficient evidence of intent to reacquire that nationality, and treat such a naturalization by operation of law as involuntary.

But the principle which justifies the exception for involuntary naturalization also defines its limits. Where intent to acquire the foreign nationality is present at the time of naturalization or intent to accept the nationality arises thereafter and is manifested by affirmative and unambiguous acts, there would appear to be no reason in law or policy to bring the case within the exception. It seems clear, for example, that where it can be shown by contemporaneous proof that the United States citizen intended by his two-year residence to reacquire his Italian citizenship, he should be held to have become "naturalized" within the meaning of section 2, and hence to have expatriated himself, notwithstanding that the naturalization was accomplished "by operation of law" and without any formal application

---

Footnotes continued.

to be a Mexican citizen. The mere fact of recording the deed otherwise makes him a citizen of Mexico. I would like to ask my friend how far we would recognize that peculiar state of the Mexican law?"

Cong. Perkins: "It does not go so far. * * *" 41 Cong. Rec. 1467.

However, this colloquy furnishes little instruction on the question before me, because neither the position of the Department of State nor that of the Service and the Board goes "so far."

[9] This principle is not in conflict with *Savorgnan* v. *United States*, 338 U.S. 491, 499–500 (1950), where it was held that an American who had applied for and accepted Italian citizenship expatriated herself notwithstanding that she did not intend to give up her American citizenship. The intent required by section 2 is not an intent to renounce United States citizenship but an intent to become naturalized in a foreign state.

for a new citizenship status. Such cases are, of course, seldom encountered. In the usual case the only evidence of the citizen's intent to reacquire Italian nationality is provided by his actions subsequent to that naturalization. So arose the doctrine of voluntary acceptance. The theory was that the naturalization by operation of law created an ambiguity as to the citizen's intention, which could be resolved by subsequent evidence of his desire to accept Italian nationality. When the citizen manifested his acceptance of Italian nationality by an overt voluntary act, this act was taken as evidence of the citizen's intent, at the time when he took up residence in Italy, to reacquire Italian nationality, and his expatriation was held to relate back to the date when his naturalization took effect under the law of Italy. *Matter of V—, supra,* at 674. Because of the obvious artificiality of a rule which related the finding of intent to acquire Italian nationality back to an arbitrary point of time, often in the remote past, the Board in *Matter of DiP—, supra,* ruled correctly that the act indicating acceptance of Italian nationality was probative only of intent at the time the act was performed, and that therefore expatriation should no longer be held to relate back but should date from the act of acceptance.

The decision in *Matter of DiP—,* however, forces recognition that the requirement of an overt voluntary act of acceptance is not, and probably never was, a rule of evidence but a rule of substance reflecting the proper interpretation of the term "naturalization" as used in section 2. The significance of the act of acceptance does not lie primarily in its value as proof of previous intent, for such value is often doubtful, but rather in its value as a manifestation of present intent. The act of acceptance is the final constituent element of a more complex act, voluntary naturalization, which entails the legal consequence of loss of United States citizenship. Since, however, it is an essential element of the ultimate fact upon which expatriation depends under the statute it cannot be equivocal but must be an act which clearly and unambiguously imports a purposeful assumption of nationality.

It has been suggested that a "naturalization" involuntary when it took place cannot be converted into a voluntary naturalization by an act occurring years afterward, and that since concededly section 2 of the Act of 1907 applies only to voluntary naturalizations, the Board's rule is an attempt to amend section 2 to create an additional act of expatriation, *i.e.,* acceptance of a previously involuntary naturalization. This argument seems to me a mere confusion of terms. As already noted, the term "naturalization" as used in the statute, because of constitutional and other considerations, must be construed to mean a voluntary and purposeful aquisition of foreign nationality. Although the involuntary acquisition of foreign nationality or the acquisition

of such nationality by operation of law certainly constitutes naturalization in one sense of the term, naturalization in the sense intended by the statute does not occur until the individual has appropriately manifested an intent to accept the foreign nationality. Acceptance thus does not serve to give legal effect to a naturalization which has already occured; it is itself an element of the naturalization made expatriating by the statute.

The construction of the statute which is proposed by the Department of State would lead to anomalous results. It would require a holding that a United States citizen naturalized in a foreign country by operation of law who may have accepted all the benefits of that status, who may even have renounced United States citizenship, would nevertheless not have lost his United States citizenship unless he had taken an oath of allegiance to the foreign state, the only other act made expatriating by section 2. I cannot doubt that such a result would be contrary to the intent of the Congress that enacted the Act of 1907, and that it would also be contrary to this Nation's often expressed recognition of the inherent right of expatriation. 15 Stat. 223–224; *Savorgnan* v. *United States, supra,* at 497–98.

Because litigation involving nationality usually arises in the context of an assertion of United States citizenship by an individual and the claim of expatriation by the Government (although compare *Kawakita* v. *United States,* 343 U.S. 717 (1952)), it is sometimes overlooked that expatriation found its place in the law initially not as a weapon of the Government but as a right of the individual. It is true, of course, that "rights of citizenship are not to be destroyed by an ambiguity," *Perkins* v. *Elg, supra,* at 337, but when a United States citizen becomes naturalized by operation of law in a foreign country and by his subsequent course of conduct clearly manifests an intention to accept the rights and obligations that go with his new nationality, I do not believe that it does violence to the language of the Act of 1907 to hold that he has expatriated himself, notwithstanding that the tender of a new status under foreign law and its acceptance by the individual do not occur contemporaneously. I believe it is more realistic and more consistent with the policy of our nationality legislation to regard the naturalization by operation of law as in effect a continuing offer, the acceptance of which completes the act of naturalization in a foreign state made expatriating by section 2.[10]

---

[10] This conclusion makes it unnecessary to consider whether an expatriation may arise in such a situation otherwise than under the provisions of the Act of 1907. See 39 Ops. A.G. 411, 412 (1940) ; *United States ex rel. Rojak* v. *Marshall,* 34 F.2d 219, 220 (W.D. Pa. 1929) ; *United States ex rel. DeCicco* v. *Longo,* 46 F. Supp. 170, 174 (D. Conn. 1942) ; *contra, Leong Kwai Yin* v. *United States,* 31 F.2d 738, 740 (C.A. 9, 1929).

Such doubts as might be raised by the contrary argument are set at rest by the long history of administrative and judicial application of the voluntary acceptance rule, *Barsanti* v. *Acheson, supra;* 3 Hackworth's *Digest,* 211–215.

## IV

As has been stated, my purpose in reviewing this case in its present posture is to resolve the conflict in interpretation between the Department of State and the Board of Immigration Appeals over continued adherence to the voluntary acceptance rule. I hold that an overt voluntary act manifesting clearly and unambiguously a decision to accept a foreign nationality previously acquired by operation of law results in the loss of United States citizenship under section 2 of the Act of 1907. What acts consitute such an acceptance and what factual showing is required to establish their character I find it unnecessary to consider at this time.

The case is remanded to the Board of Immigration Appeals for disposition in accordance with the views set forth herein.